The STATE ex rel. JENKINS

v.

QUINCY FOUNDRY et al.

[Cite as *State ex rel. Jenkins v. Quincy Foundry* (1992), 80 Ohio App.3d 774.]

Court of Appeals of Ohio,
Franklin County.

No. 91AP–238.

Decided May 19, 1992.

*John R. Workman,* for relator.

*Millisor & Nobil, John R. Slater* and *John J. Krimm, Jr.,* for respondent Quincy Foundry.

*Lee Fisher,* Attorney General, *Cordelia A. Glenn* and *Gerald H. Waterman,* Assistant Attorneys General, for respondent Industrial Commission of Ohio.

WHITESIDE, Judge.

This original action in mandamus was, pursuant to Civ.R. 53 and Loc.R. 11 of this court, referred to a referee who has rendered a report recommending that the requested writ of mandamus be denied, to which both relator Russell H. Jenkins and respondent Quincy Foundry have filed objections.

Relator objects to the referee's report, contending that Ohio Adm.Code 4121:1–5–17(I) places such a duty upon an employer to protect its employees from the hazards of molten metal operations that merely making equipment available to employees on an optional basis does not comply with the safety standard. Respondent Quincy Foundry objects to the referee's report in three respects: (1) that the appropriate safety requirements are those set forth in former IC–5 and IC–7, rather than the present Ohio Administrative Code; (2) that relator's position as a jacket line shifter does not fall within the meaning of a "molten metal operation," to which Ohio Adm.Code 4121:5–1–17(I)(3)

could be applied if it were applicable; and (3) that the injuries sustained by relator were not caused by a hazard, known or unknown, within the contemplation of Ohio Adm.Code 4121:5–1–17.

 Turning first to the objection of respondent Quincy Foundry to the application of Ohio Adm.Code 4121:1–5–17(I), rather than former IC–5 and IC–7, the Industrial Commission concluded that the former provisions do not apply because the injury occurred in 1986, and IC–5 and IC–7 were effective only prior to August 1, 1977. The essential finding of the Industrial Commission was that the regulation in question "requires personal protective equipment, including protective clothing and safety shoes when there is a 'known hazard' recognized as injurious to the health or safety of the employee." The commission further found that "the claimant did not work in the hazardous metal pouring area of the foundry when the accident took place" but, instead, "was working in an area where he assembled the molds and jackets and took them off after the metal was poured."

In support of its contentions, respondent Quincy Foundry points out that the jacket line on which relator was working at the time of his injury was installed in 1976 prior to the adoption of the present regulations under the Ohio Administrative Code. Respondent Quincy Foundry also points out that Ohio Adm.Code 4121:5–5 and 4121:1–7 include a grandfather provision providing that "installations or constructions built or contracted for prior to the effective date" shall be deemed to comply with the provisions of the Ohio Administrative Code provided such installations or construction complied with any applicable specific requirement in effect at the time such installation was constructed or contracted for. While this is an appropriate provision to rely upon, it applies only to constructions or installations and does not purport to apply to personal protective equipment required to be supplied to employees. In other words, the grandfather provision relied upon by respondent Quincy Foundry applies only to the machinery or equipment which was constructed or manufactured prior to 1977 and has no application to safety equipment required to be supplied to employees for their protection while utilizing such equipment. Accordingly, the reliance upon former IC–5, which contained no provision for the use of protective equipment with respect to molten metal exposures, does not control. Accordingly, this objection to the referee's report is overruled.

 Respondent Quincy Foundry's second objection to the referee's report is to the referee's recommended conclusion that relator's jacket line shifter position constituted a molten metal operation within the contemplation of Ohio Adm.Code 4121:1–5–17(I)(3). Relator's job duties and the description of how

the accident occurred are set forth in the Industrial Commission investigation report, as follows:

"That his job duties were to place weights onto the precasted sand mold which would come down a conveyor line. That he also would put a jacket onto the mold as it traveled down the line to be poured. That upon the mold's return, i.e., after being poured and cooled, the claimant would remove the weights and then the jacket. On 1–21–86, claimant was removing a jacket from a mold, # 3 Hunter jacket, 20″ by 24″ and twenty (20″) inches high when the mold exploded causing molten iron to run out onto the claimant's left leg and foot, thus causing his accident of record."

The pertinent regulation, Ohio Adm.Code 4121:1–5–17(I)(3), reads in pertinent part, as follows:

"All employees exposed to the hazards created by welding, cutting, brazing, or molten metal operations shall be protected by protective clothing. This includes:

"(a) Flameproof gauntlet gloves.

"(b) Flameproof aprons made of leather, or other material which provides equivalent protection.

"(c) Exterior clothing made of wool, cotton, or other material chemically treated to reduce combustibility.

"(d) Capes or shoulder covers made of leather or other material which provides equivalent protection.

"(e) Protection for the ears from overhead welding and cutting or welding and cutting in extremely confined spaces."

Unfortunately, the regulation does not define "molten metal operations." Respondent Quincy Foundry contends that the jacket line does not constitute a part of the molten metal operations, arguing to the effect that "molten metal operations" includes only molten metal pouring operations. Neither the Industrial Commission nor the referee made a specific finding upon this issue. The commission in its findings stated that some evidence "indicated that the claimant did not work in the hazardous metal pouring area of the foundry when the accident took place. He was working in an area where he assembled the molds and jackets and took them off after the metal was poured." It is difficult to conceive how it can be seriously contended that "molten metal operations" does not include all operations involving working with molten metal and is limited to the pouring operation.

The evidence includes a transcript of the testimony before the respondent Industrial Commission. One of the witnesses was a thirty-seven-year employee of Quincy Foundry who, at the time of the accident, was employed as a

melt foreman and was relator's immediate supervisor. On direct examination, he testified that they had no accidents on the jacket line and, therefore, did not make it mandatory for workers to wear safety equipment, although they were "available" if the workers sought them out from a locker. On cross-examination, however, he testified that this was not the first time a mold had broken and lost its contents and that breaking of a mold is a foreseeable event in the foundry business. He testified specifically that this occurs "once in awhile, not often." He further testified that, if a mold breaks in the iron pouring area, there is not a great risk to the worker "[b]ecause you take a guy pouring the molds, they've got weights and jackets on them. If that mold don't hold it just runs out down into a trench on the floor." However, he also testified that in the jacket line there is no such trench in the floor to protect the workers. He further testified that, if relator had been wearing chaps at the time of the accident, it would have "probably helped."

The foundry manager testified, "[a]t that time, we had never had a previous mold break loose like this one had. We didn't deem it necessary to wear them [chaps]." He also conceded that the molten iron could be in a liquid state when it reached the jacket line area, although ordinarily there would be adequate cooling time.

Under the circumstances, there was no basis for the commission to find that the operation in question was not a molten metal operation within the contemplation of the regulation. Nor did the respondent commission so find; instead, it concentrated upon whether a "known hazard" existed. Accordingly, this objection of respondent Quincy Foundry is not well taken.

■ By its third objection, respondent Quincy Foundry contends that the referee erred in failing to recommend a finding that the injuries sustained by relator were caused by a hazard, known or unknown, not contemplated by Ohio Adm.Code 4121:1–5–17. We, likewise, find no merit to this contention, inasmuch as Ohio Adm.Code 4121:1–5–17(E) provides that "[f]oot protection should be made available by the employer and should be worn by the employee where * * * an employee is handling material which presents a foot hazard." Such a hazard existed here, as is evidenced by the injury that resulted. Similarly, Ohio Adm.Code 4121:1–5–17(I)(3) expressly provides that: "All employees exposed to the hazards created by * * * molten metal operations shall be protected by protective clothing." The hazard contemplated by this regulation is the employee working in the molten metal operation coming into contact with some of the molten metal. This is what occurred here.

The commission found that the hazard was not a "known hazard" because the melt foreman and former foundry manager "stated they did not have any previous problems with the mold in question" and "that they had no knowl-

edge of other employees burned in this area by molten metal." This is not the correct standard for determining what is a hazard. The hazard exists regardless of whether there has been a previous injury if there is a danger of the occurrence of that which actually occurred in the given case causing the injury. There was ample evidence presented by relator and other witnesses, including an expert, as to the nature of the danger of the occurrence of an injury from molten metal in the area where relator was working at the time of the accident. However, under the some-evidence rule, we must look to the evidence most favorable to and supporting the commission's findings.

█ There was evidence supporting the conclusion that there have been no prior problems with the mold in question. The former foundry manager, however, testified that it was "conceivable" that a mold still containing molten metal could reach the jacket line area, although that was not the general intent of the operation. He theorized that the problem in question was caused by a "core run-in," but that the company had no record of the frequency of this type of problem, which would be in the "scrap reports," but that there had been none that anybody could remember in the jacket line. He also testified that workers in the jacket line were not required to wear any type of fire retardant clothing, although they were available if the workers sought them out.

The melt foreman who had been employed by the company for thirty-seven years stated that the occurrence of a mold breaking and losing its contents was "once in awhile, not often." He agreed that this had happened previously at the foundry and was a foreseeable event. When asked as to the risk of workers working both in the iron pouring area or on the jacket line, he indicated that the worker is not always at risk, explaining by a statement that, "[y]ou take a guy pouring the molds, they've got weights and jackets on them. If that mold doesn't hold it just runs out down into a trench on the floor," but a worker in a jacket line does not have such a trench to protect him, although the metal could run in under the pallet line itself but that there is no trough for that purpose. Accordingly, this objection is not well taken.

██ Relator's objection is upon the basis that the referee was incorrect in finding that the respondent commission correctly found that merely making equipment available on an optional basis to employees complies with the requirement of the regulation to provide such equipment. The Industrial Commission found that:

" * * * [T]he employer had provided safety glasses, safety chaps, and safety shoes. In fact, the claimant had previously used these when he was working as an iron pourer. They were still available for his use while working as a 'jacket line shifter.' * * * "

Upon the basic issue, we agree with relator. It is not sufficient for an employer to make equipment available at the option of an employee where the regulation specifically requires that the employee "shall be protected by protective clothing" when engaged in certain operations. Ohio Adm.Code 4121:1–5–01(B)(124) provides that: " 'Shall' [is] to be construed as mandatory." Such regulation requires the employer to make use of the protective equipment mandatory for its employees. If made mandatory by the employer, the failure of an employee to utilize such equipment provided by the employer is not the result of the failure of the employer to require the wearing of the required protective clothing, at least in the absence of evidence that this was the ordinary method of operation, with the mandatory requirement being little other than pro forma. Here, it was conceded that no protective clothing was required to be used on the jacket line portion of the molten metal operation.

The safety equipment required by Ohio Adm.Code 4121:1–5–17(I)(3) consisted at most of four types: (1) flameproof gauntlet gloves; (2) flameproof apron; (3) exterior clothing treated to reduce combustibility; and (4) capes or shoulder covers made of leather. The fifth item, protection for the ears, does not apply to molten metal operations.

At the time of the accident, according to his own testimony, relator was wearing fire safety boots, a brown uniform, fire retardant gloves, but no type of fire retardant pants, jacket, apron, skirt, or chaps. Also, according to his testimony, the hot iron hit him just below his knee and just above his boot and ran down into his boot. Accordingly, as to the failure to provide capes or shoulder covers, there is no issue here since, as the Industrial Commission found, it was relator's foot and leg below the knee that were injured. Similarly, there is no issue as to flameproof aprons since none was provided, and there is no requirement in the regulation that the apron extend down below the knee. As to exterior clothing treated to reduce combustibility, none was required or provided by the employer, although there was evidence that chaps were used in the pouring area and were available at the areas of some lockers if the employee made the extra effort to avail himself of them.

Nevertheless, it is somewhat difficult to find that relator has demonstrated a clear legal right to the requested writ since he has not demonstrated an express violation of the regulation in question. To the extent that fire retardant gloves and boots were required to be provided, they were, and relator was wearing them at the time. The provision of Ohio Adm.Code 4121:1–5–17(I)(3)(c) is a different matter. However, the clothing is required to be "made of wool, cotton or other material chemically treated to reduce combustibility." In fact, one of the items of evidence before the Industrial Commission, the affidavit of the industrial safety consultant, Fred Melof,

indicates that the requirements of which there has been much discussion herein may stem from the federal OSHA requirements, rather than those of the Ohio Administrative Code, since he characterizes the violations by respondent Quincy Foundry as being failure to provide "aluminized knee-length leggings with extended covering over the top of the employee's feet," and failure "to provide chaps made of fire retardant material." Neither of these is expressly required by the Ohio Administrative Code, even if they are required by OSHA. In other words, relator has not demonstrated a violation of a *specific* safety requirement which was a proximate cause of his injury. By relator's own testimony, the chaps which were utilized on the pouring area had to be replaced every two weeks. Even if the chaps are considered an acceptable substitute for the specified apron, they were not required to be furnished. There is nothing to indicate that the required apron would have afforded protection to relator's leg below the knee. For this reason, relator has not demonstrated a clear legal right to the requested writ. Accordingly, relator's objection is well taken only as to the providing of safety equipment.

For the foregoing reasons, all of respondent's objections to the referee's report are overruled, but relator's objection is sustained to the extent that the regulation requires more than merely making the required safety equipment available for use at the option of the employee. This court approves and adopts only the findings of fact of the referee but not the conclusions of law, and for the reasons stated herein and in said referee's report to the extent consistent herewith, the requested writ of mandamus is denied.

*Writ denied.*

BOWMAN and DESHLER, JJ., concur.